IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVE SAENZPARDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 10-00049-CG-M |
| | ) | |
| UNITED FRAMING CONSTRUCTION | ) | |
| COMPANY, INC. and MATTHEW | ) | |
| DAVID NERO, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This matter is before the court on defendant, United Framing Construction Company, Inc.'s, motion for summary judgment. (Doc. 58). The parties have filed briefs and filed evidentiary materials in support of their respective positions (Docs. 58-1, 101, 102 and 103), and the motion is now ripe for resolution. After careful consideration of the foregoing, the court concludes that the motion is due to be **GRANTED**.

## I. FACTUAL BACKGROUND

In the early morning hours of June 2, 2008, a vehicle owned and driven by the co-defendant, Matthew Nero, struck and injured the plaintiff, Steve Saenzpardo, while Saenzpardo was walking along Alabama Highway 59. (Doc. 101, p. 1), (Doc. 58-5, p. 18). Nero is a carpenter from Malvern, Ohio, and was in Baldwin County to work for co-defendant, United Framing Construction Company, Inc. ("UFC"), on the construction of the Whispering Pines apartment complex in Daphne, Alabama (the

1

"Whispering Pines project").  <u>Id.</u>  While working on the Whispering Pines project, Nero lived with his supervisor, William Ruthe, a UFC superintendent who also worked on the Whispering Pines project, in housing paid for by UFC (the "Cottage"). (Doc. 58-5, p. 28).

The previous day, Sunday, June 1, 2008, was Nero's day off from work.  <u>Id.</u> at p. 32.  He decided to drive to the beach at Orange Beach, Alabama, and was accompanied by Ruthe and by Omar Ortez, a foreman for Valesquez Construction, a subcontractor on the Whispering Pines project.  (Doc. 101, p. 22).  Arriving around noon, the three men spent the day at the beach and at the "Florabama" bar, where Nero admits that he had "two or three" beers.  (Doc. 58-5, p. 32).  Later that night, while returning to Daphne from Orange Beach, Nero was driving in the north-bound lane of Highway 59 when he struck Saenzpardo.

It is undisputed that Nero did not perform any work on the Whispering Pines project on the Sunday morning that he, Ruthe, and Ortez departed for Orange Beach.  (Doc. 58-5, p. 41).  It is also undisputed that the truck Nero drove to Orange Beach and back was his personal vehicle.  (Doc. 58-5, p. 27).

## II.  SAENZPARDO'S MOTION FOR LEAVE TO FILE A MOTION TO STRIKE

Saenzpardo has filed a motion for leave to file a motion to strike portions of, and exhibits to, UFC's reply brief.  (Doc. 103).  Saenzpardo points to the fact that the court's April 29, 2011, order (Doc. 92) required that "any supplementation to [a] presently pending summary judgment motion [was] due by 6/24/2011."  On May 28,

2011, the court noted that no supplementation was filed, and set the briefing schedule for the instant case.  (Doc. 100, p. 1).

Nevertheless, in its reply brief, dated July 29, 2011, UFC offered "Supplemental Suggestions of Determinations of Undisputed Fact and Conclusions of Law," as well as excerpts from the deposition of Joe Key.  (Doc. 102, p. 3).  UFC argues that Key's deposition was not available at the time UFC filed its motion for summary judgment.  Id. at fn. 1.  However, UFC has offered no explanation for why it did not offer the excerpts from Key's deposition by the June 24, 2011, deadline.

As Saenzpardo has not had the opportunity to address the "undisputed" facts and conclusions of law set forth in UFC's reply brief, the court treats Saenzpardo's motion for leave as a motion to strike, and grants the motion.  Accordingly, the court will not consider UFC's supplemental suggestions of determinations of undisputed fact and conclusions of law featured in its reply brief (Doc. 102, pp. 3-4), nor will it consider the cited excerpts of Key's deposition testimony. (Doc. 102-1).

### III.  SPOLIATION OF EVIDENCE

In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997).  "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case," Vick v. Texas Employment Com'n, 514 F.2d 734, 737 (5th Cir. 1975) (quoting McCormick, Evidence § 273 at 660-61 (1972); 31A C.J.S. Evidence § 156(2) (1964)).

The party claiming spoliation must present "probative evidence" that the relevant materials were "purposely lost or destroyed." Bashir, 119 F.3d at 931.

Saenzpardo argues that UFC is not entitled to summary judgment because it has "willfully, and in bad faith, spoliated material documents in this matter." (Doc. 101, p. 3). The documents in question consist of UFC payroll documents (the "Quicken files") that allegedly were stored on a computer owned and used by UFC president, Ray Garner. Id. at p. 4. On January 18, 2011, Garner testified at his deposition that the computer "crashed" approximately one year prior, and that the Quicken files were no longer on the machine. (Doc. 101-2, p. 74). Subsequently, on February 18, 2011, Garner corrected his deposition testimony in a sworn affidavit, stating that the computer in question did not "crash," but rather, "all company computer files have been deleted." (Doc. 60-1, p. 2). UFC later produced the computer to Saenzpardo on March 17, 2011, and a forensic inspection of the computer's hard drive showed that the hard drive was functioning as recently as March 11, 2011, and that the Quicken files were intentionally deleted from the computer on that same date. (Doc. 101, p. 4). Accordingly, Saenzpardo requests that the court impose an adverse inference against UFC concerning its culpability in general and, specifically, Nero's employment status and acts in the "line and scope" of his employment. Id. at p. 6.

On April 21, 2011, the court held an evidentiary hearing regarding Saenzpardo's Renewed Motion for Sanctions regarding this and other discovery-related disputes, and denied Saenzpardo's motion. (See Minute Entry for

proceedings held before Magistrate Judge Bert W. Milling, Jr: Motion Hearing held on 4/21/2011).

Saenzpardo asserts that "the deleted payroll and reimbursement (lodging/gas/food/drink) records are material as they speak to the employment status and/or 'line and scope' of Nero's and Ruthe's employment." (Doc. 101, p. 5). However, for the reasons enumerated below, the court finds that, even if Nero were held to be an employee of UFC rather than a 1099 subcontractor, Nero was not acting within the line and scope of his employment at the time of the accident. Thus, the issue of employment status is moot. Additionally, even if the court infers that the deleted files contained evidence of regular fuel reimbursements from UFC to Nero for fuel costs incurred in commuting to and from work, the court finds that the trip to Orange Beach was not a "coming and going" susceptible to the exception to the "coming and going" rule. See infra. The court also notes that Saenzpardo's allegations are that Ruthe, and not Nero, received direct fuel reimbursements from UFC. (Doc. 101, p. 11). Thus, the materiality of the Quicken files is far from certain, and the court declines to impose the requested sanctions.

## IV.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine

5

whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in [the non-moving party's] pleading; rather, its response .... must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## V.  SAENZPARDO'S CLAIM OF RESPONDEAT SUPERIOR LIABILITY AGAINST UFC

### A. Statement of the Law

The Supreme Court of Alabama has held that an act is within an employee's scope of employment if the act "is done as part of the duties the employee was hired to perform or if the act confers a benefit on his employer."  Hulbert v. State Farm Mut. Auto Ins. Co., 723 So.2d 22, 23 (Ala. 1998) (citing Jessup v. Shaddix, 275 Ala. 281, 283 (Ala. 1963).  In Solmica of the Gulf Coast, Inc. v. Braggs, 285 Ala. 396, 401 (Ala. 1970), the state Supreme Court stated that: " '[t]he rule ... for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment.' " (citing Nelson v. Johnson, 264 Ala. 422, 427 (Ala. 1956)).  The state Supreme Court further stated in Solmica, 285 Ala. at 401, that "[t]he conduct of the employee, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment."

Whether an alleged wrong is committed by the employee during his regular working hours is not dispositive of the question of whether the employee was acting within the scope of his employment.  Hulbert, 723 So.2d at 24.  Instead, the dispositive question is whether the employee was engaged in an act that he was hired to perform or in conduct that conferred a benefit on his employer.  Id.  Stated

differently, "[r]esponsibility of the master for acts of the servant does not arise simply from the circumstance that at the time of the injury the person inflicting it was in the employment of another.  The act inflicting the injury must have been done in pursuance of authority, either express or implied.  That is, it must be an act which is fairly incident to the employment, in other words, an act which the master has set in motion.'" Alabama Fuel & Iron Co. v. Powaski, 166 So. 782, 783 (Ala. 1936) (quoting Goodloe v. Memphis, etc., R.R. Co., 18 So. 166, 167 (Ala. 1895)).

Where an employee is driving to or from work, the Supreme Court of Alabama has stated "[t]he general rule is that an employee using an automobile, whether belonging to his master or to himself, in going to and from his place of work, is not at such times regarded as engaged in work for his master but is acting solely for his own purposes." Smith v. Brown-Service Ins. Co., 250 Ala. 613, 615 (Ala. 1948) (citing Hill v. Decatur Ice & Coal Co., 219 Ala. 380 (1929); Bourus v. Hagen et al., 192 Wash. 588 (1937); Brown v. Bond, 190 Miss. 774 (1941); Nagy v. Kangesser, 32 Ohio App. 527 (1928); Antilley v. Jennings et al., 183 S.W.2d 982 (Tex.Civ.App. 1944); Halsey v. Metz, 93 S.W.2d 41 (Mo.App. 1936); Smith v. Fine, 351 Mo. 1179, (1943).  An exception to this rule arises when the employee's transportation expenses constitute a part of the consideration paid for his services. Gilmore v. Rust Engineering Co., 265 So.2d 591, 595 (Ala. 1972).  However, this exception only applies to employees of a company, and not to independent contractors.  Shaw v. C.B. & E., Inc., 630 So.2d 401, 404 (Ala. 1993) (citing Hays v. Deaton Truck Line, 87 So.2d 825 (Ala. 1956); Taylor v. General Refrigeration Sales

Co., 165 So. 572 (Ala. 1936); Great Atlantic & Pacific Tea Co. v. Donaldson, 156 So. 865 (Ala. App. 1934)).

## B. Legal Analysis

UFC concedes that there is "some disagreement as to Mr. Nero's job title" for the Whispering Pines project, but asserts that even if the court finds that he was an employee, Nero still was not acting within the line and scope of his alleged employment with UFC.  (Doc. 58-1, p. 8).  UFC argues that Nero's work on the Whispering Pines project did not require him to travel to Orange Beach, approximately 50 miles away from the job site.  Id.  Furthermore, UFC argues that Nero was not in the process of running an errand such as picking up or delivering materials for the Whispering Pines project, nor was he on his way to or from the job site.  Id.  Rather, UFC insists that Nero's trip to Orange Beach was a purely personal trip, taken on his day off from work, and which conferred no benefit on UFC.  Id. at p. 9.

Not surprisingly, Saenzpardo asserts that Nero was acting within the scope of his employment at the time of the accident by claiming that (1) the accident falls within the exception to the "coming and going" rule as discussed in Shaw; (2) Nero's trip to Orange Beach and back falls within the "dual purpose doctrine;" (3) Nero's presence in Alabama while working on the Whispering Pines project broadens the "line and scope" of his employment; (4) Nero's actions in striking Saenzpardo along Highway 59 were set in motion by UFC; and (5) Nero was hired as an

"accommodation driver" for Ruthe, whose own driver's license was suspended.  (Doc. 101, pp. 8-16).

## (1) Exception To The Coming and Going Rule

Saenzpardo asserts that "it is undisputed that Nero was in the process of 'coming and going' in that he and Ruthe were in the process of returning to the company-provided housing."  (Doc. 101, p. 20).  Saenzpardo also points to Nero's claim to have been a superintendent for UFC, (Doc. 58-5, p. 27), and Garner's testimony that UFC paid for gasoline for superintendents' vehicles.  (Doc. 101-2, p. 87).  If there is evidence that Nero was a superintendent employed by UFC and was paid or reimbursed for fuel, then, Saenzpardo argues, the exception to the "coming and going" rule applies and Nero can arguably be found to have acted within the line and scope of his employment.  (Doc. 101, pp. 20-21).

Saenzpardo is correct that no dispute appears to exist regarding the fact that Nero and Ruthe were driving to the Cottage (Doc. 101-2, p. 27); that Nero was living at the Cottage (Doc. 101-2, p. 35); and that the Cottage was paid for by UFC (id.). However, Saenzpardo's attempt to tie Nero's and Ruthe's journey to the "coming and going" rule in order to establish that the exception applies is without support. The Supreme Court of Alabama established the parameters of the "coming and going rule" as pertaining to "[a]ccidents that occur while an individual is travelling to and from work."  Shaw v. C.B. & E., Inc., 630 So.2d at 404.  But Saenzpardo does not allege that Nero was travelling to or from work, and points to no supporting fact which establishes or even tends to establish that Nero was driving to or from the job

11

site; to or from an errand that took him away from the job site; or to or from some other UFC job site.  Instead, Saenzpardo seizes on the fact that Nero and Ruthe were travelling to the Cottage, which was paid for by UFC.  In so doing, Saenzpardo does not cite any authority which expands the meaning of travel "to and from work" to mean travel "to and from housing paid for by a company and supplied to employees."

The court therefore finds that the exception to the "coming and going" rule does not apply to Nero's trip from Orange Beach to the Cottage, because the "coming and going" rule itself is not appropriate to an analysis of the facts where, as here, there is no allegation that Nero was on his way to or from work.

### (2) Applicability of the Dual Purpose Doctrine

Where an employee's trip served both his purposes and those of his employer, then the dual purpose doctrine applies.  American Auto Ins. Co. of Missouri v. Hinote, 498 So.2d 848, 850 (Ala.Civ.App. 1986) (citing Eddie Wallace's Garage v. Arreaga, 406 So.2d 405 (Ala.Civ.App. 1981)).  "Accidents occurring during such journeys arise out of and in the course of employment if the trip involves performance of a service for the employer which would have necessitated a trip by someone if the employee had been unable to perform that service in connection with his personal journey." Eddie Wallace's Garage, 406 So.2d at 406.  The doctrine generally arises in the area of workmen's compensation claims, and, in fact, the court was not able to find an instance where the doctrine was discussed outside of the context of workmen's compensation.  Nevertheless, where the dual purpose

doctrine applies, an employee's act may be found to have arisen within the scope of employment.  <u>American Auto Ins. Co.</u>, 498 So.2d at 850.

Saenzpardo hypothesizes that the trip to Orange Beach had a dual purpose in that it allowed Ruthe and Ortez to discuss with Garner (via cell phone) an upcoming inspection by the City of Daphne of the Whispering Pines project.  (Doc. 101, pp. 21-22).  Saenzpardo points to Nero's and Garner's testimony as evidence of this theory.  (Doc. 101, p. 21).  Nero testified that he could not recall whether or not he ever received occasional phone calls from Garner on Saturdays or Sundays, and could not recall with certainty whether Garner had previously called him after normal business hours.  (Doc. 58-5, p. 43).  Presumably, this fact is meant to show that Nero could have spoken with Garner via telephone on the day of the accident, which was a Sunday.  Garner testified that Ruthe was issued a company cell phone, on which Garner called at least once a day.  (Doc. 101-2, p. 76).  Saenzpardo also points to the presence of Ortez during the drive from Daphne to Orange Beach as evidence that the trip had a dual purpose, (Doc. 101, p. 22), because Nero testified that he and Ruthe had never socialized with Ortez before (Doc. 101-2, pp. 27-28), and because Garner testified that if a problem existed prior to the inspection, he would have expected Ruthe and Ortez to resolve the problem.  (Doc. 101-2, p. 126).

These facts do not justify applying the dual purpose doctrine, which would require, at the very least, an allegation or indication that if Ruthe and Ortez had not discussed the upcoming inspection during the drive to Orange Beach, then they would have had to make a separate trip in order to do so.  <u>See</u> <u>American Auto. Ins.</u>

Co. of Missouri v. Hinote, 498 So.2d 848, 850-51 (Ala. Civ. App. 1986).  This line of reasoning is absurd, as Ortez and Ruthe could have discussed the upcoming inspection at any time, regardless of whether or not they were on a trip to the beach.

Instead, Saenzpardo simply speculates that Nero, Ruthe, and Ortiz discussed work matters, perhaps with Garner via cell phone, while driving to Orange Beach. (Doc. 101, p. 22).  Saenzpardo cites no deposition testimony which suggests or establishes that such a conversation actually took place, and accordingly, the court does not find that the dual purpose doctrine is appropriate.[1]

### (3) Broadened Line and Scope of a Travelling Employee

Saenzpardo argues that, because Nero is a resident of Ohio and was in Alabama for the purpose of working on the Whispering Pines project, he was a "travelling employee," and his scope of employment was broadened.  (Doc. 101, p. 23).  Noting the dearth of Alabama authority addressing this argument, Saenzpardo relies on a number of workmen's compensation cases and cases from other states for support.  The court addresses each in turn.

In the one Alabama case which arguably touches on this issue, Hurlbert v. State Farm Mut. Auto Ins. Co., 723 So.2d 22, supra, a nanny was travelling out of state in her own car, following her employer's car en route from Louisiana to a vacation with the employer's family in Florida, when she was involved in an

---

[1] The court notes that, notwithstanding his discovery dispute regarding cell phone records, Saenzpardo apparently chose not to ask Nero or Garner if any such cell phone conference took place while Nero, Ruthe, and Ortez were en route to Orange Beach.

accident in Mobile County, Alabama.  <u>Hurlbert</u>, 723 So.2d at 22-23.  One of the

employer's children was in the car with the nanny at the time of the accident.  <u>Id.</u>

The other party involved in the accident sued the employer, alleging respondeat

superior liability and asserting that the nanny was acting within the scope of her

employment at the time of the accident.  <u>Id.</u> at 23.  The case made its way via

appeal to the Supreme Court of Alabama, which ruled that summary judgment was

not appropriate in the case because a genuine issue of material fact existed as to

whether the nanny was acting either for personal motives or employment motives.

<u>Id.</u> at 24.  The court based its decision on the facts in evidence, which included: (1)

an affidavit from the plaintiff's husband, who stated that shortly after the accident,

he heard the employer state that the nanny was going to the beach with his family

to help care for his children; (2) the undisputed fact that one of the employer's

children was in the car with the nanny at the time of the accident; (3) the

undisputed fact that the nanny was to receive her regular salary for the week spent

at the beach; and (4) the employer paid for the nanny's lodgings at the beach.  <u>Id.</u>

Saenzpardo points to this last factor and argues that, because Nero was out of state

and because UFC paid for the Cottage, the same or similar fact pattern therefore

exists in this case.  (Doc. 101, p. 23).

     <u>Hurlbert</u> is distinguishable from this case, because the evidence produced by

the plaintiff in <u>Hurlbert</u> was suggestive of a benefit conferred upon the employer to

a degree not reflected by the facts before this court.  Particularly compelling in

<u>Hurlbert</u> is the affidavit containing the employer's statement that the nanny was

travelling with his family to care for his children.  That statement was supported by the fact that one of the employer's children was in the car with the nanny.  The only somewhat similar fact in this case, by contrast, is that UFC paid for the Cottage. There is no allegation that UFC paid for lodging in Orange Beach, and no evidence on the record that Nero's trip to the beach conferred a benefit on UFC.[2]  These factual differences thus make <u>Hurlbert</u> an inapposite precedent upon which to base a denial of summary judgment.

Saenzpardo also argues that, in the context of workers' compensation claims, Alabama law treats a travelling employee as within the course of employment at all times.  (Doc. 101, p. 23) (<u>citing</u> <u>Young v. Mutual Sav. Life Ins. Co.</u>, 541 So.2d 24 (Ala. Civ. App. 1989); <u>McDaniel v. Helmerich & Payne Int'l Drilling Co.</u>, 61 So.3d 1091, 1093 (Ala. Civ. App. July 30, 2010)).  The court notes as an initial matter that both cases cited by Saenzpardo deal with the question of whether a particular injury occurred "in the course of employment" and whether the injury "arose out of… employment" which are defined terms specific to workmen's compensation claims.  <u>Young</u>, 541 So.2d at 26.  Saenzpardo has not connected the legal standard applicable in these cited workmen's compensation cases to the legal standard of respondeat superior to be applied by the court in this case.

Furthermore, both of the cited cases are distinguishable from this case.  In <u>Young</u>, the Alabama Court of Civil Appeals found that the plaintiff-employee, a travelling salesman, was within the course of his employment at the time of his

---

[2] See the court's discussion of the dual purpose doctrine in Section 2, <u>supra</u>.

accident because he was within his prescribed sales territory.  Id.  In this case, however, there is no evidence or allegation that Nero's trip to Orange Beach was within any prescribed, employment-related territory, other than the general allegation that Nero was in the state of Alabama for work.  Secondly, the Young court found that the plaintiff-employee had "departed on his own personal enterprise" at the time of his injury; therefore, the injury was not causally related with the claimant's employment.  Id. at p. 27.  If anything, this point tends to support UFC's argument that Nero's trip was not related to his job.  In McDaniel, the plaintiff-employee was travelling from one work site to another when he was involved in a motor vehicle accident.  McDaniel, 61 So.3d at 1093.  The plaintiff-employee had spent the previous night in an employer-owned bunkhouse, which was located on the job site itself.  Id.  The employee-plaintiff was then ordered by his employer to travel to another job site at 5:00 a.m., to attend a safety meeting, and he was involved in an accident en route to the safety meeting.  Id. at 1093-94.  The McDaniel court found that the employee's injury occurred "as part of a journey not only contemplated, ***but required***, by the employer…" Id. (emphasis added).  Saenzpardo has pointed to no evidence in the record which suggests that Nero's trip was required by UFC, nor that he was en route to or from a job site when the accident took place.

Saenzpardo also relies on the state Supreme Court's opinion in Land v. Shaffer Trucking, Inc., 275 So.2d 671, 674-75 (Ala. 1973), to argue that the fact that Nero was returning to the Cottage is a significant factor in determining whether he

17

was acting within the scope of his employment.  (Doc. 101, p. 23).  Indeed, the <u>Land</u>

court did state that the direction in which the employee is travelling may be, "and

often is," a significant factor in determining whether the employee is acting within

the scope of employment.  However, <u>Land</u> nevertheless undercuts Saenzpardo's

argument by holding that:

> "when a servant has abandoned his employment by the
> master, the mere fact that he is returning thereto does
> not of itself reinstate the servant in the master's
> employment and establish the engaging in the master's
> business so as to subject the master to liability and for
> damages resulting after the abandonment and before
> return is an accomplished fact."

<u>Land</u> at 675 (citation omitted).  The facts on the record fit this language neatly,

while nothing in <u>Land</u> requires the court to conclude that Nero was acting within

the scope of his employment simply because he was on the return leg of his journey

rather than on the outbound leg.

　　Another case cited by Saenzpardo, <u>International Business Machines, Inc. v.</u>

<u>Bozardt</u>, 275 S.E.2d 376 (Ga. Ct. App. 1980) is similarly distinguishable from this

case, because the employer, IBM, conceded the fact that its employee was driving a

rental car, the expense of which was fully paid by IBM (as opposed to being owned

by IBM).  <u>Id.</u> at 378.  IBM also conceded that the facts of the case gave rise to a

presumption that the employee was acting within the scope of his employment at

the time the decedent was struck.  <u>Id.</u>   Moreover, the <u>Bozardt</u> court focused on the

fact that the employee was a travelling salesman, who "must of necessity eat and

sleep in various places in order to further the business of his employer ..."  <u>Id.</u> at

379.  The acts undertaken by IBM's employee, which were found to be within the scope of his employment, were limited to certain acts such as lodging in a hotel or going to or from a meal, because:

> "… [t]he eating of meals, while a pleasure indulged in by a traveling salesman and all mankind, is as necessary to the continuance of his duties as the breath of life; and where his duties take him away from his home, his acts of ministration to himself should not and we believe do not take him outside the scope of his employment, so long as he performs these acts in a normal and prudent manner.'"

Id. (quoting Thornton v. Hartford Accident & Indem. Co., 32 S.E.2d 816 (Ga. 1945)). Saenzpardo attempts to connect the Bozardt court's holding with Nero's trip to Orange Beach, by stating that "[UFC] understood that by placing Nero and Ruthe in Baldwin County that they would have to leave the cottage to eat."  (Doc. 101, p. 25).  But this argument is, to say the least, a stretch.  There is nothing in the record which suggests that Nero had to drive all the way to Orange Beach in order to obtain proper food and proper rest incidental to the performance of his job, nor that he had to travel to Orange Beach to sleep.

Saenzpardo also quotes a case from the California Appeals Court, Jeewarat v. Warner Bros. Entertainment, Inc., 177 Cal. App. 4th 427 (Cal. App. 2 Dist. 2009) for the proposition that "acts necessary to the comfort, convenience, health, and welfare of the employee while at work, though strictly personal and not acts of service, do not take the employee outside the scope of employment …" (Doc. 101, p. 24) (quoting Jeewarat at 843).  However, the Jeewarat court explicitly limited their holding to address an employee's attendance at an out-of-town business conference, which in

California may be considered a "special errand" under the "special errand doctrine." Id. at 431.  When an employee intends to drive home from the special errand, the errand is not concluded simply because the employee drives his regular commute route, but rather, the errand is concluded when the employee returns home or deviates from the errand for personal reasons.  Id. at 432.  Given the extensive testimony on the record that the purpose of Nero's trip was personal recreation at the beach, rather than anything that could be deemed a "special errand" on behalf of UFC, Jeewarat is of limited applicability.

Finally, Saenzpardo cites General Accident Insurance Co. v. Safeco Insurance Companies, 443 S.E.2d 813 (S.C. App. 1994) for persuasive support.  Again, the facts of the cited case are distinguishable from the facts of the instant case.  In General Accident, the South Carolina appeals court held that an employer was liable for injuries to a pedestrian struck by their employee, who was out of town for a sales meeting, had arrived one day early, and was going to dinner following an optional golf tournament.  Id. at 815.  The employee rented the car that was involved in the accident in accordance with instructions from his supervisor.  The employer "was to reimburse [the employee] for the cost of this rental."  Id. Furthermore, the General Accident court found that the employee's early arrival before the sales convention was "incidental to his employer's purpose of having [him] at the meeting in time for the convention's afternoon commencement."  Id. at 819.  The court also found that it was "reasonably inferable that [employee's] participation in the golf tournament on Sunday morning with other persons

attending the meeting was consistent with the purpose of the meeting." Id.  Here, despite Saenzpardo's speculation that Nero, Ruthe, and Ortez may have discussed the Whispering Pines project while driving to Orange Beach, there is no record evidence which would support a reasonable inference that Nero's trip to Orange Beach was incidental to any purpose of UFC's, nor that his trip was consistent with any UFC purpose.

### (4) Events Set In Motion By UFC

Saenzpardo argues that Nero was acting within the scope of his employment when the accident happened because his actions were "set in motion" by UFC – that is, UFC placed Nero, an Ohio resident, in Baldwin County to work on the Whispering Pines project; provided Nero housing which was not within walking distance of the project site or within walking distance of a grocery store; and provided gasoline reimbursement to Ruthe, who had no valid driver's license and who Saenzpardo speculates may have paid for Nero's gasoline.  (Doc. 101, pp. 25-26).

Saenzpardo does not really connect these facts in the record with the "set in motion" standard that he cites in Alabama Fuel & Iron Co. v. Powaski, 166 So. 782, 783 (Ala. 1936).  The fact that the Cottage was not within walking distance either of the job site or a grocery store is irrelevant to a determination of whether Nero was acting within the scope of his employment.  It is undisputed that Nero did not hit Saenzpardo on his way to or from the job site, or while he was driving to or from a grocery store.  Rather, the accident happened on the shoulder of Gulf Shores

Parkway, between County Roads 8 and 10, (Doc. 58-5, p. 66) approximately 30 miles away from Daphne.  Furthermore, the fact that Ruthe received a gasoline reimbursement, by itself, does not tell the court anything about Nero's scope of employment because Saenzpardo has not pointed to any evidence that Ruthe actually paid for gasoline on the trip to Orange Beach.  Saenzpardo instead simply speculates that Ruthe may have paid for Nero's gasoline.  (Doc. 101, p. 26).  In so doing, Saenzpardo presumably hopes to establish that the accident falls within the exception to the "coming and going rule" discussed in <u>Shaw</u>, where an employee's accident may fall within the scope of employment when an employer pays for transportation expenses.  <u>See</u> <u>Shaw</u>, 630 So.2d at 404.  But assuming, <u>arguendo</u>, that Ruthe had paid for Nero's fuel with funds he received from UFC, Saenzpardo has not offered any evidence that Nero was travelling to or from the job site, or to or from any work-related errand that benefitted UFC.  Furthermore, he has cited no binding or persuasive authority that supports the notion of expanding the scope of the exception to the "coming and going rule" to encompass a day-long personal trip to a destination approximately 40 miles away from both the job site and company-funded housing.

### (5) Nero As Accommodation Driver

Saenzpardo argues that the facts in the record would allow a jury to reasonably conclude that Nero was employed by UFC in part to act as Ruthe's driver, as Ruthe did not possess a valid driver's license at the time of the accident. (Doc. 101, pp. 26-27).  Saenzpardo points to the fact that Nero was allowed to live in

the Cottage despite his claimed status as a subcontractor, and points to Garner's failure to name even one other subcontractor who had ever lived in the Cottage previously. Id. at p. 9. Saenzpardo also points to Nero's testimony that he "carpooled" with Ruthe to and from work approximately twice a week as evidence that that he was hired in part to shuttle Ruthe to work and back. (Doc. 101-2, p. 15). Saenzpardo argues that discrepancies between UFC's payroll information and Nero's 1099 are further evidence that he was hired as Ruthe's driver, as are unaccounted for payments made to Nero which "likely represent accommodation driver payments." (Doc. 101, p. 11). Also, Saenzpardo claims that Ruthe's fuel reimbursement "likely included reimbursement for gasoline to Nero's vehicle." (Doc. 101, p. 12). Finally, Saenzpardo argues that the inclusion of Ruthe on UFC's general liability insurance policy and the provision of workers' compensation insurance to Ruthe and Nero comprises "substantial evidence" that UFC conferred "special benefits and pay" upon Nero to be Ruthe's driver. Id. at p. 13.

This line of argument is germane to the question of Nero's status as an employee versus his status as a subcontractor, but does little to address whether he was acting within the scope of his alleged employment at the time he struck Saenzpardo on the Gulf State Parkway. Even if Saenzpardo's allegations were relevant, however, the fact remains that they essentially amount to speculation and innuendo, representing an attempt to gather together insufficient facts and testimony in order to achieve some kind of critical mass sufficient to survive summary judgment. The fact that Nero lived at the Cottage while working on the

Whispering Pines project may arguably undercut Nero's status as a subcontractor, but, by itself, it reveals nothing to suggest that UFC hired him for the purpose of chauffeuring Ruthe around Baldwin County.  In fact, Nero's testimony suggests that he was not Ruthe's driver, because he stated at his deposition that the two men carpooled "two times a week, maybe," and that "if we wanted to ride together, we would; if not, we took our own vehicle[s]." (Doc. 101-2, pp. 15-16).  The same logic applies to Saenzpardo's claims about Nero's unaccounted-for compensation.  Such payments could conceivably cast doubt upon UFC's claim that Nero was a subcontractor, but without additional evidence, they do not necessarily lead to a reasonable inference that such payments were made because Nero was Ruthe's driver.  Nothing in the record provides support for Saenzpardo's sweeping assertion that such payments "likely represent accommodation driver payments."

Saenzpardo's argument concerning Ruthe's gasoline reimbursement is similarly speculative.  Not one testimonial statement cited in Saenzpardo's brief suggests that Ruthe bought Nero's gas; instead, Saenzpardo cites Garner's testimony to the effect that Garner did not know if Ruthe ever paid for gas for Nero's vehicle.  (Doc. 101, p. 11) (citing Doc. 101-2, p. 96).  Even if Saenzpardo were able to conclusively show that Ruthe paid for Nero's gas whenever the two carpooled to and from work, the pertinent question in this case is whether Ruthe or UFC paid for gas on the trip to or from Orange Beach.  However, Saenzpardo did not raise this question in his brief, nor apparently did he ask Nero or Garner at their respective depositions.

24

The court is further unconvinced by Saenzpardo's argument regarding UFC's general liability policy or its provision of workers' compensation insurance. Saenzpardo offered no evidence that such insurance policies conferred a "benefit" upon Nero in exchange for acting as Ruthe's driver, nor has he offered any explanation whatsoever as to how such policies brought Nero within the scope of employment at the time of the accident.

For the reasons enumerated above, the court finds that Saenzpardo has failed to establish that a genuine dispute exists as to whether Nero was acting within the scope of his alleged employment at the time of the accident. Based on the record evidence, the court finds that no reasonable jury could infer that Nero was engaged in UFC business or that he was performing a service on UFC's behalf when he struck Saenzpardo. Accordingly, UFC's motion for summary judgment is **GRANTED** with respect to Saenzpardo's respondeat superior claim.

## VI.  SAENZPARDO'S CLAIMS OF NEGLIGENT HIRING AND SUPERVISION AGAINST UFC

To meet the burden of proof in a negligence action, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff to be injured. Ford Motor Co. v. Burdeshaw, 661 So.2d 236, 237 (Ala. 1995); Martin v. Arnold, 643 So.2d 564, 566 (Ala. 1994).

Saenzpardo does not allege in his complaint that UFC owed him a duty of care. (Doc. 1, p. 5). However, in his opposition to summary judgment, Saenzpardo

25

argues that under Alabama law, even where a party has no affirmative legal duty to act in a particular way in relation to another, that party may voluntarily assume such a duty, and can be charged with performing the duty with reasonable care and may be held liable for injury resulting from a breach of that duty.  (Doc. 101, p. 28) (quoting Martin By & Through Martin v. Goodies Distrib., 695 So.2d 1175, 1179 (Ala. 1997) (citing Parker v. Thyssen Min. Constr., Inc., 428 So.2d 615 (Ala. 1983)).

Saenzpardo asserts that because UFC voluntarily undertook a duty to investigate whether its employees' drivers' licenses were valid, it voluntarily assumed a legal duty to protect other drivers and pedestrians on Alabama roads. (Doc. 101, p. 28).  By limiting its investigation of drivers' licenses to Georgia licenses, UFC allegedly breached that duty by not investigating Nero's Ohio driving record, which revealed a history of accidents and citations.  Id.

UFC, however, argues that there can be no liability under a negligence theory without "legally connecting the events occurring in an accident to the breach of a duty owed by another."  (Doc. 102, pp. 13-14) (citing South Coast Properties, Inc. v. Schuster, 583 So.2d 215 (Ala. 1991)).  Because Nero was hired as a carpenter and not as a driver, UFC argues that there is no legal connection between UFC's alleged supervision, control, or monitoring of Nero on the one hand, and the accident on the other hand.  Id. at p. 14.

After reviewing the record evidence, and keeping in mind the court's ruling with regard to the scope of employment issue, supra, the court finds that UFC did not breach any legal duty by failing to investigate Nero's Ohio driving record.

26

Saenzpardo has not established a genuine dispute about the fact that Nero was hired as a carpenter and not as a driver, and where there is no allegation that UFC was under any statutory obligation to conduct background checks on its employees and subcontractors for projects in Alabama, this court will not expand tort liability to a third party for an accident that took place during a personal outing to the beach.  Furthermore, Saenzpardo has not alleged, either in his complaint or in his opposition to summary judgment, that UFC's alleged failure to investigate Nero's Ohio driving record was the proximate cause of the accident.

Accordingly, UFC's motion for summary judgment with regard to Saenzpardo's claims for negligent hiring and supervision is **GRANTED.**

## VII. CONCLUSION

Upon a thorough analysis of all matters presented, the court concludes that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  UFC's motion for summary judgment (Doc. 58) is therefore **GRANTED** as to all claims.

**DONE** and **ORDERED** this 21st day of October, 2011.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE